**Bradley B. BRIGHAM, Plaintiff,**

v.

**SUN LIFE OF CANADA, Defendant.**

**No. Civ.A. 00–30182–MAP.**

United States District Court,
D. Massachusetts.

Feb. 6, 2002.

Cristobal Bonifaz, Amherst, MA, for Plaintiff.

Joseph M. Hamilton, Jay P. Symonds, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, for Defendant.

*MEMORANDUM REGARDING DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT*(Docket Nos. 35 and 39)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff Bradley Brigham brought suit against Sun Life of Canada ("Sun Life") after Sun Life terminated his long term disability benefits. In his three-count complaint, Brigham alleged violations of Mass.Gen.Laws ch. 93A, breach of contract, and violations of 29 U.S.C. §§ 1001 *et. seq.* ("ERISA"). In April of 1999, this court granted summary judgment for the defendant on Counts one and two after finding that those counts were preempted by ERISA. Both parties now move for summary judgment on the third and final count of the complaint. For the reasons set forth below, this court will allow defendant's motion and deny plaintiff's.

## II. *FACTS*

The facts are essentially undisputed. Bradley Brigham ("Brigham") is a 45–year–old male who resides in Colrain, Massachusetts. (Docket No. 1 at 2; Docket No. 41 at 1). At the age of 16, he was injured in a motorcycle accident that rendered him paraplegic. (Docket No. 41 at 1). Despite this devastating injury, Brigham diligently pursued a rehabilitation program, which enabled him to become self sufficient in the activities of daily life. (Docket No. 41 at 1). He also attended Williams College and Amherst College and now holds a Masters Degree. (Docket No. 37 at 1). From 1986 to 1990, Brigham worked for a social services organization as interim executive director. This job required him to supervise thirty employees and three offices. (Docket No. 22 at 109).

In Spring of 1990, Brigham began to work as a job placement specialist with Community Enterprises, Inc. ("Community Enterprises"), another social services organization. In this capacity, he served as an advisor regarding the employment of handicapped persons. (Docket No. 41 at 1). The job required him to visit various employers each day, resulting in frequent transfers from his car to his wheelchair and back. These car-to-wheelchair transfers required Brigham to lift his wheelchair out of and into his car. The regular strain of this task caused him to twist his upper torso in an awkward manner and use his arms both more frequently and

more vigorously than he previously had. (Docket No. 41 at 1–2).

On September 1, 1992, Sun Life issued an Employee Group Benefit Plan to Community Enterprises, which provided Community employees with both short term and long term disability benefits. (Docket No. 22 at 1–26). The Plan provides long term disability benefits for the first sixty months of a totally disabling illness if it prevents the employee "from performing all the material duties of his *regular* occupation." (Docket No. 22 at 35) (emphasis supplied). To qualify for long term benefits after the sixty-month mark, the employee's illness must prevent him "from engaging in *any* occupation for which he is or becomes reasonably qualified by education, training, or experience." (Docket No. 22 at 35) (emphasis supplied). In order to qualify for benefits, proof of disability must be satisfactory to Sun Life.[1]

In August of 1992, Brigham consulted his family doctor, Dr. Christopher French ("Dr.French") due to pain in his left side. He underwent a series of tests and evaluations, which revealed that the pain was the result of muscle strain, which was itself caused by the frequent car to wheelchair transfers. (Docket No. 41 at 2).

In June of 1993, Brigham developed a respiratory tract infection that caused him to have severe coughing spells. The combination of the left side pain and the coughing spells was so overwhelming that Brigham had to stop working. In July of 1993, Brigham applied for short term disability benefits under the contract between Community Enterprises and Sun Life. (Docket No. 22 at 79). He was thereafter placed on short term disability insurance for six months. (Docket No. 41

at 2). In December of 1993, a month before the short term benefits were scheduled to expire, Brigham applied for long term disability benefits under the provision covering disability from his "regular" occupation, citing pain and spasms due to severe back and side strain as the cause of his disability. (Docket No. 22 at 93).

In the Attending Physician Statement ("APS") that was submitted on December 21, 1993, Dr. French opined that Brigham was incapable of performing his own job because "the strain of frequent transfer from [his] car [is an] intolerable physical symptom." (Docket No. 22 at 98). However, Dr. French categorized Brigham's physical impairment as a "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." This description put Brigham's disability in "Class 4" (out of 5) on the APS. (Docket No. 22 at 98). Even though he stated that Brigham was totally disabled, Dr. French believed that he was a "good candidate for more sedentary work but to do that he must get retraining." *Id.* at 98. Dr. French submitted no objective medical evidence in support of his conclusions. *Id.*

In January of 1994, the Social Security Administration ("SSA") approved Brigham's application for Long Term Disability payments. (Docket No. 41 at 2). Shortly afterwards, on February 16, 1994, Sun Life approved the payment of Long Term Disability Payments to Brigham under the "regular" occupation provision. After discounting the $529.00 that Brigham received each month from the SSA, Sun Life granted Brigham benefits in the amount of $777.07 per month. (Docket No. 41 at 3).

---

1. The Plan states: "We may require proof in connection with the terms or benefits of this Policy. If proof is required, we must be provided with such evidence *satisfactory to us* as we may reasonably require under the circumstances (emphasis added)." (Docket No. 22 at 50).

On February 28, 1994, Sun Life offered vocational rehabilitation services to Brigham. After conversing with Brigham via phone, the vocational training specialist noted Brigham's doubts concerning the availability of opportunities for someone with his experience and disability, and offered her opinion that Brigham's concerns were probably well founded. (Docket No. 41 at 3). In the record of their conversation dated March 11, 1994, the specialist also noted that Brigham had formally applied to law school and that it appeared that he was not in need of assistance. (Docket No. 41 at 3; Docket No. 22 at 126).

In March of 1994, Sun Life asked Dr. French for an update on Brigham's medical condition. In a letter dated March 31, 1994, Dr. French responded:

> [Brigham] is a paraplegic who developed left side and hip pain secondary to [the] frequent car to chair transfer [that] his work requires. These symptoms have improved following several months of leave from work. I believe that he should avoid situations that require frequent car to chair transfers.

(Docket No. 22 at 129).

On May 16, 1994, Sun Life's medical consultant reviewed Brigham's file and noted that there was no objective evidence of any disability. (Docket No. 22 at 144). On the APS forms, it was clearly written that acceptable "objective findings" included "current x-rays, EKG's, laboratory dates and any clinical findings." (Docket No. 22 at 97). Nonetheless, Sun Life decided to continue paying benefits, pending confirmation of the number of car to chair transfers that was required for Brigham's job. (Docket No. 2 at 149).

On July 8, 1994, Sun Life carried out an extensive interview with Brigham for the purpose of assessing his condition. At that time, Brigham re-stated his belief, as well as that of Dr. French, that his disability was caused "by taking his wheelchair in and out of the back seat to his vehicle 15 to 20 times a day while calling on businesses, which was part of his duties at work." (Docket No. 22 at 159).

In October of 1994, Brigham submitted his third APS from Dr. French. Once again, Dr. French's diagnosis was low back strain, but he failed to give objective medical evidence to support his conclusion beyond his own opinion. (Docket No. 22 at 172). Furthermore, Dr. French reported that Brigham's condition remained unchanged, but nevertheless increased the level of Brigham's physical impairment to Class 5, a "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity." (Docket No. 22 at 173). In noting his prognosis, Dr. French found that Brigham was totally disabled. Again, however, under the section entitled "Rehabilitation," Dr. French indicated, somewhat inconsistently, that a job modification would enable Brigham to work despite his impairment. Specifically, he stated that Brigham would be able to work if his job did not involve getting into and out of his car. (Docket No. 22 at 173).

In a letter dated November 9, 1994, Dr. French stated that Brigham's back pain had improved since he stopped working. However, he opined that the problems would resurface if Brigham were to return to his current job; Dr. French recommended instead that he be placed in a job that did not require him to get in and out of his car all day. (Docket No. 22 at 197). On December 7, 1994, Dr. French stated in a conversation with a Sun Life representative that Brigham's condition had improved and that the muscle strain had resolved. (Docket No. 22 at 208). About two weeks later, Maureen Speed ("Speed"), Sun Life's medical consultant, contacted Dr. French to clarify his Novem-

ber 9, 1994 letter. At that time, Dr. French informed Speed that Brigham was indeed able to get in to and out of his car, but if he had to do it ten to twelve times a day he might have a recurrence of pain. (Docket No. 22 at 219).

On January 4, 1995, Sun Life cancelled Brigham's Long Term Disability benefits based on the medical evidence in his file and the conversation between Dr. French and Speed, which led it to conclude that he was no longer disabled from performing his regular occupation. (Docket No. 22 at 223). Brigham thereafter appealed Sun Life's decision. In support of his claim, he proffered letters from Drs. French and Perri in which they stated that he was totally disabled from performing his regular occupation. (Docket No. 22 at 226–27). More specifically, Dr. French's letter insisted that "[Brigham's] muscular-skeletal condition is fragile; his ability to transfer is severely limited and is possible only with assistance and then with discomfort." (Docket No. 22 at 226). Dr. Perri stated that:

> The pain has gotten better because he has not been working and has not been transferring in and out of the car as often. If he was to return to work, I have no doubt that this would lead to a return of his pain.... He would be able to work, however, if transportation was provided for him.

(Docket No. 22 at 227).

Because they felt that Dr. French's letter contradicted the information that he gave Speed, Sun Life, in a letter dated February 28, 1995, asked him to clarify the exact nature of the alleged disabling condition, noting that "the possibility of a problem recurring in and of itself does not constitute a disabling condition." Sun Life also emphasized that "objective medical information to support the continued disability is necessary." (Docket No. 22 at 229). In a letter dated March 8, 1995, Dr. French insisted that his statement regarding Brigham's ability to get into and out of his car was limited to one or two transfers, with the implication that Brigham lacked the ability to return to a job that required multiple transfers each day. (Docket No. 22 at 232). After receiving the clarification, along with confirmation from Community Enterprises that Brigham would have to transfer five to ten times per day depending on the job, Sun Life reversed its decision, reinstating Brigham's benefits on March 15, 1995. (Docket No. 22 at 200 and 234). No further mention was made at that time of the need for objective, medical evidence. (Docket No. 41 at 4).

In October of 1995, the fourth APS was submitted. Dr. French's diagnosis was "muscle strain and fatigue." Even though he indicated that Brigham's condition remained unchanged, Dr. French determined that Brigham's physical impairment was between Class 4 and 5. Dr. French concluded that Brigham was totally disabled but that a job modification would enable him to work despite his impairment, stating that "with [an] appropriate part time job and available transportation [Brigham] could re-enter the work force." (Docket No. 22 at 244). Once again, no objective medical evidence in the form of x-rays, EKG's or clinical findings was provided.

In November of 1996, Dr. French submitted his fifth APS. The diagnosis was "lower back and flank sprain." He described Brigham's progress as "unchanged" but this time classified his physical impairment as Class 4. Once again, he described Brigham's prognosis as "totally disabled" and opined that a job modification would enable him to work to some extent. (Docket No. 22 at 270–71). No objective medical findings were provided. (Docket No. 22 at 270).

On June 23, 1997, a sixth APS was submitted. This time, Dr. French's diagnosis was "T–7 paraplegic with no use of lower extremities [and] overused and strained upper extremities." He maintained that Brigham's progress was unchanged and indicated again that his physical impairment was a Class 4; (*i.e.* capable of sedentary activity). Lastly, Dr. French opined that Brigham was totally disabled, but this time offered no comment on whether a job modification would enable him to work. In the section for objective findings, Dr. French referred the reader to Dr. Mark Funk ("Dr.Funk") and Dr. John Reinert ("Dr.Reinert"). (Docket No. 22 at 314–15).

In January of 1998, Brigham submitted his seventh APS from Dr. French. Dr. French's diagnosis was the same. He classified Brigham's progress as unchanged, and characterized his physical impairment as Class 4. With regard to Brigham's physical limitations, Dr. French noted that, in a given day, Brigham could sit five to ten hours and drive between one to three hours. Furthermore, he opined that Brigham was capable of simple and firm grasping and fine manipulation, and that he could bend, twist, push, pull, grasp, and reach for up to 33% of the day. He also believed that Brigham's maximum lifting capacity was ten pounds. As for Brigham's work capabilities, Dr. French stated that he could possibly work at his current occupation on a part-time basis within the stated limitations, and that he could possibly work part-time in another occupation. Despite this, he asserted for the first time (under the section entitled "vocational rehabilitation") that a job modification would be insufficient to enable Brigham to work with his impairment. Under the space for objective findings, Dr. French again referred Sun Life to Drs. Funk and Reinert. (Docket No. 22 at 287–88).

On October 27, 1998, Sun Life informed Brigham that he was nearing the 60–month end point for his long term disability benefits, at which time it would be necessary for him to provide evidence of total disability from *any* occupation. (Docket No. 22 at 291).

In December of 1998, Dr. French completed the eighth and final APS. His diagnosis was "T–7 Paraplegia no use of legs." He described Brigham's progress as "unchanged" and classified his physical impairment as Class 4. Once again, Dr. French opined that on any given day, Brigham could sit for 5 to 10 hours, drive for 1 to 3 hours, twist, push, pull, and reach for up to 33% of the day and grasp for up to 66% of the day. The space for Brigham's maximum lifting capacity was left blank. Dr. French added that Brigham was incapable of working at his regular occupation even with the stated limitations and incapable of working in another occupation. Moreover, he stated that no job modification would enable him to work with his impairments. Under the section for his prognosis, Dr. French emphasized his opinion that Brigham was permanently disabled. (Docket No 22 at 293–94). No objective medical evidence was submitted to support his findings.

On January 18, 1999, Sun Life informed Dr. French that it needed additional medical information to aid in its decision-making process. (Docket No. 22 at 299). In response, Dr. French sent copies of his handwritten notes, lab reports, and a personal care assistance evaluation. (Docket No. 37 at 9).

Sun Life's medical consultant reviewed Brigham's medical records in March of 1999 and concluded that he was not restricted from sedentary work. (Docket No. 22 at 338). Sun Life subsequently requested that a Transferable Skills Analysis ("TSA") be conducted. (Docket No. 22

at 347). The TSA report was received by Sun Life on June 15, 1999. Based on Dr. French's findings, the report concluded that Brigham's functional capacities were sufficient to enable him to perform sedentary work. (Docket No. 22 at 350). In fact, the report found that Dr. French's description of Brigham's capacities was approximately equivalent to the definition of "sedentary" as defined in the Dictionary of Occupational Titles, except for a reference to walking and standing:

> *Sedentary:* Exert up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking, standing are required only occasionally (up to 1/3 of the time) and all other sedentary criteria are met.

(Docket No. 22 at 351). Included in the TSA Report was a list of jobs that exist in the U.S. economy and for which Brigham was qualified based on his work history and education. Prior to commencing the search, Brigham's worker trait profile was adjusted to account for the fact that his paraplegia prevented him from walking or standing. (Docket No. 22 at 361). As a result, twenty-one occupations that were consistent with Brigham's abilities and functional capacities were identified. (Docket No. 22 at 360). Descriptions of a sampling of the jobs revealed that they required either little or no travel. (Docket No. 22 at 361–363).

On June 15, 1999, Sun Life informed Brigham of its decision to terminate his long term disability benefits. In reaching this decision, Sun Life relied on: Dr. French's medical reports, the medical consultant's review and the Transferable Skills Analysis report. (Docket No. 22 at 365).

On July 29, 1999, after receiving Sun Life's decision on his long term disability claim, Brigham appealed. Sun Life acknowledged the appeal and advised Brigham that:

> to review a file as an appeal, you must submit objective medical evidence in support of continuing total disability, as defined by the Policy.... Such information would include, but not be limited to, medical records, diagnostic test results and hospital records, which document the presence of a condition to the extent it would be disabling, from December 18, 1998 to the present.

(Docket No. 22 at 366).

Brigham was given sixty days to submit his evidence. On December 8, 1999, Sun Life extended the period to submit objective evidence an additional thirty days. At the end of the ninety-day period, Brigham had submitted: (1) a letter from Dr. French dated June 28, 1999 in which he disagreed with Sun Life's conclusion that Brigham was not materially disabled from carrying out the material duties of any gainful occupation;[2] (2) a letter from Dr. Reinert dated September 9, 1999;[3] (3) an

---

**2.** In support of his opinion, Dr. French made the same assertions that he expressed in his letter of February 13, 1995: "Mr. Brigham's muscular-skeletal condition is fragile, his ability to transfer is severely limited, and is possible only with assistance and then with discomfort ... Mr. Brigham is in a continuous state of total incapacity to perform the duties of any assignment given the disabilities described above." (Docket No. 22 at 392). On August 24, 1999, Sun Life sent a letter to Dr. French, asking him to submit the objective test results on which he based his statements. (Docket No. 22 at 370). The Administrative Record does not contain any response from Dr. French to this request.

**3.** In his letter, Dr. Reinert, who first met Brigham following the motorcycle accident in

affidavit of Lillian Brigham (Brigham's mother); (4) an affidavit of Althea Brigham (Brigham's aunt and personal attendant); (5) an affidavit of Harold A. Brigham (Brigham's father); (6) an affidavit of Kenneth Noyes (a family friend); and (7) an approval notice from the Massachusetts Division of Medical Assistance for 20 hours/week of assistance with daily tasks. (Docket No. 22 at 392, 393, 388, 389, 390, 391, 395 respectively).

On January 28, 2000, Sun Life informed Brigham that it was affirming its previous decision. In the reasons given for the decision, Sun Life acknowledged the submission of the letters and affidavits mentioned above, but explained that the submissions did not rise to the level of "objective medical evidence" and were therefore insufficient to support his argument that he was incapable of performing *any* occupation. (Docket No. 22 at 399). Furthermore, Sun Life noted that it relied on (1) Dr. French's repeated indications that Brigham would be capable of carrying out the duties of a sedentary occupation; (2) the conclusions in the medical consultant's report; (3) the conclusions of the TSA Report; and (4) the lack of medical documentation supporting Brigham's inability to perform any occupation. *Id.*

## III. *DISCUSSION*

### A. *Standard of Review*

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this case, Brigham bears the burden of making a showing sufficient to establish that Sun Life's decision to terminate benefits was unreasonable. *See Terry v. Bayer Corporation,* 145 F.3d 28 (1st Cir.1998).

"[A] denial of benefits under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v.*

---

1972, offers his opinion in almost entirely conclusory terms:

> [Brigham] feels, and rightly so in my opinion, that the physical problems resulting from those three years of employment have left him totally disabled insofar as he can no longer accomplish on a regular schedule what he could previously do. For example, it takes him much longer to accomplish things such as management of bladder and bowel function as well as proper skin care management. At the time that he developed the left flank pain he also noted pain in his right shoulder area making it more difficult for him to frequently lift his wheel-

chair into and out of the car. Were he only in his 20's instead of his late 30's at the time this happened he may have been able to recover from the problem that developed in 1992. But with the gradual decline in physical capabilities that we all experience as we get older, in Brad's case superimposed on the significant disability of being paraplegic, he had been unable to recover to the level of function pre–1992. His problem is quite self evident, and I feel that any additional studies to further evaluate the problem would be superfluous and unnecessary.

(Docket No. 22 at 379).

*Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The First Circuit has applied the *de novo* standard of review when reviewing benefits determinations unless the benefits plan makes a *clear* grant of discretionary authority to the plan administrator. *See Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 583 (1st Cir.1993); *see also Terry,* 145 F.3d at 37. When a clear grant of discretionary authority is found, *"Firestone* and its progeny mandate a deferential arbitrary and capricious standard of judicial review." *Recupero v. New England Tel. and Tel. Co.,* 118 F.3d 820, 827 (1st Cir. 1997).

■ According to the Sun Life plan, "[Sun Life] may require proof in connection with the terms or benefits of [the] Policy." The policy further states: "If proof is required, we must be provided with such evidence satisfactory to us as we may reasonably require under the circumstances." (Docket No. 22 at 50). The phrase "satisfactory to us" clearly grants to Sun Life discretionary authority over eligibility decisions. In this case, therefore, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion. *See Vlass v. Raytheon Employees Disability Trust,* 244 F.3d 27, 29–30 (1st Cir.2001).

Although there are no First Circuit cases that construe the meaning of the phrase "satisfactory to us," other Courts of Appeal have interpreted similar language to be grants of discretionary authority, mandating application of the arbitrary and capricious standard. *See Herzberger v. Standard Insurance Co.,* 205 F.3d 327, 331 (7th Cir.2000), *citing Donato v. Metropolitan Life Insurance Co.,* 19 F.3d 375, 379 (7th Cir.1994) (in case where entitlement to benefits was conditioned on submission of proof "satisfactory to us," "to us" signaled the subjective, discretionary charac-

ter of the judgment to be made); *Kinstler v. First Reliance Standard Life Insurance Co.,* 181 F.3d 243, 252 (2d Cir.1999) (distinguishing between the phrases "[proof] satisfactory to the decision-maker" and "satisfactory proof [of total disability to us]," the former establishing a subjective standard and the latter an objective one); *Perez v. Aetna Life Insurance Co.,* 150 F.3d 550, 557 n. 8 (6th Cir.1998) (noting that Aetna could have obviated the controversy over the appropriate standard of review by inserting the language "to us" after the phrase "satisfactory evidence" since it "has long been the law in the Sixth Circuit that plans containing such language clearly grant discretion to the plan administrator"). Furthermore, judges in the District of Massachusetts have regularly construed the phrase "satisfactory to us" to indicate a clear grant of discretionary authority. *See Metropolitan Life Insurance Co. v. Socia,* 16 F.Supp.2d 66, 69 (D.Mass.1998); *Miller v. Wang Laboratories, Inc.,* 998 F.Supp. 78, 80 (D.Mass.1998).

Under the arbitrary and capricious standard, the administrator's decision must be upheld "if it is reasoned and 'supported by substantial evidence in the record.'" *Vlass,* 244 F.3d at 30, *quoting Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 109 (1st Cir.1997). A decision is supported by "substantial evidence" when the evidence is reasonably sufficient to support the conclusion. *See Doyle v. Paul Revere Life Insurance,* 144 F.3d 181, 184 (1st Cir.1998). Furthermore, "the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary." *Vlass,* 244 F.3d at 30, *citing Sprague v. Director, Office of Workers' Compensation Programs, etc.,* 688 F.2d 862, 865–66 (1st Cir.1982). Thus, the central issue before the court is whether defendant's decision to deny benefits was

reasoned and supported by substantial evidence in the record.

B. *Analysis*

■ In making its decision to deny benefits, Sun Life relied on: (1) Dr. French's repeated indications that Brigham was capable of carrying out the duties of a sedentary occupation; (2) the conclusions in the medical consultant's report; (3) the conclusions of the TSA Report; and (4) the lack of medical documentation supporting Brigham's inability to perform other occupations. (Docket No. 22 at 399). Other evidence, which Sun Life apparently found unpersuasive, included the additional letters from Drs. French, Reinert, and Perri, the affidavits of Brigham's family and friends, and the approval of twenty hours of weekly assistance by the Massachusetts Division of Medical Assistance.

As noted in detail above, five of the eight Attending Physician Statements submitted by Dr. French indicated that Brigham was capable of sedentary work, including the last APS submitted on December 18, 1998, though it also stated, inconsistently, that Brigham was permanently disabled. (APS numbers 1 and 5–8; Docket No. 22 at 98, 270, 314, 287, 293). In addition, the fourth APS described plaintiff's physical impairment as between Class 4 and 5, meaning that plaintiff was somewhere between being capable and incapable of sedentary activity. In sum, six of the eight APS's suggest to some extent that plaintiff was capable of sedentary work. Moreover, the APS forms make clear that the word "sedentary," as used on the forms, corresponds to the definition in the federal dictionary of occupational titles. (Docket No. 22 at 98).

Dr. French's prognoses and opinions on work capability over the five-year period also support Sun Life's decision to deny long term disability benefits. In the first APS, Dr. French stated that Brigham would be a "good candidate" for more sedentary work, after he received retraining. (Docket No. 22 at 98). In the third through fifth APS's, Dr. French stated that a job modification would enable plaintiff to work, adding in the fourth statement that, in order to do so, Brigham would need an appropriate part-time job and transportation. (Docket No. 22 at 173, 244, 271). It was not until January of 1998, the date of the seventh APS, that Dr. French claimed that a job modification would not enable Brigham to work. (Docket No. 22 at 288). However, Dr. French conceded that plaintiff might possibly be able to work part time at his own job or another. *Id.* In December of 1998, two months after plaintiff was advised of his need to prove disability from *any* occupation, Dr. French reasserted in his eighth APS that a job modification would not enable plaintiff to work. Moreover, Dr. French averred for the first time in this APS that Brigham could not work part-time at all. (Docket No. 22 at 294). No objective findings were included to support these rather dramatic changes of opinion. In summary, Dr. French's last two statements were inconsistent with his previous opinions. As no objective evidence was submitted to support this drastic change of opinion, it was reasonable for Sun Life to consider the possibility that notification to Brigham of the impending end of the sixty-month period may have influenced the opinions on Dr. French's form. At a minimum, the change appears arbitrary and unexplained.

■ Admittedly, the medical consultant's report is short in nature. However, the consultant relied on the medical information in plaintiff's file when making the determination, including the statements and notes of Dr. French. (Docket No. 22

at 338). In fact, the consultant's conclusions were based in part on Dr. French's repeated findings that plaintiff was capable of sedentary activity. *Id.* Plaintiff argues that it was arbitrary and capricious to give more weight to the medical consultant's conclusions than to those of Drs. French, Reinert and Perri, especially since there is no evidence on the record that the medical consultant was a member of the medical profession. (Docket No. 44 at 6–8). However, Sun Life's reliance on the medical consultant's report, along with other evidence, to reach a conclusion that differed from plaintiff's doctors is not necessarily indicative of arbitrary and capricious behavior. *See Glenn v. Life Insurance Company of North America,* 240 F.3d 679, 681 (8th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 212, 151 L.Ed.2d 151 (2001) (finding that "[t]he mere fact that the Company reached a decision contrary to the beneficiaries' medical evaluator, when the Company based its decision on substantial evidence in the record, including the report of a medical reviewer outside of the Company, does not give rise to serious doubts about whether the denial was arbitrary."); *Donato v. Metropolitan Life Insurance Company,* 822 F.Supp. 535, 540 (N.D.Ill.1993) (concluding that Met Life's decision to terminate benefits was not arbitrary and capricious just because it came down to a choice between the opinions of the plaintiff's doctors on the one hand and that of an independent medical consultant on the other); *Chandler v. Raytheon Employees Disability Trust,* 53 F.Supp.2d 84, 91 (D.Mass.1999) (finding that the existence of contrary medical assessments by plaintiff's treating physicians does not

change the analysis under the arbitrary and capricious standard).

Plaintiff argues that the TSA report was based entirely on an "imaginary conclusion" regarding his functional capacities. (Docket No. 44 at 8). However, again, the TSA report was based on the plaintiff's functional capacities as described by Dr. French in his last two APS's. Under the "Functional Capacities" section of the TSA report, the author writes:

> According to Dr. French, Mr. Brigham may return to work that is sedentary in nature. He may work five to ten hours a day without limitation on grasping and fine manipulation, and may drive from one to three hours daily. He must avoid all squatting, climbing, balancing, kneeling, and crawling. However, he may be required to occasionally bend, twist his body, push, pull, and reach.

(Docket 22 at 350–51). This is the way plaintiff's functional capacity is described in both the seventh and eighth APS reports, and this description appears to fit the definition in the Dictionary of Occupational Titles.[4] (Docket No. 22 at 287 and 293). Moreover, before searching for alternative occupations, "the worker trait profile was ... adjusted to account for the limitations presented currently by Mr. Brigham." (Docket No. 22 at 351). Considering the foregoing, defendant was not unreasonable in relying, in part, on the TSA report when making its determination to terminate benefits.

■ Finally, Sun Life was not unreasonable in requiring that plaintiff provide objective medical evidence in support of his claim. *See Metropolitan Life Insurance Co. v. Socia,* 16 F.Supp.2d 66, 69–70

---

**4.** *"Sedentary:* Exert up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, or pull or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walk-

ing or standing for brief periods of time. Jobs are sedentary if walking, standing are required only occasionally (up to 1/3 of the time) and all other sedentary criteria are met." (Docket No. 22 at 351).

(D.Mass.1998) (finding that, in a plan where claimant must be disabled from performing her own job for the first 24 months and disabled from performing any job thereafter, "it could not be arbitrary for [the administrator] to require additional [medical] documentation when the Plan itself required an additional showing"). As noted, under the Sun Life Plan, defendant may require evidence that is "satisfactory to [Sun Life]." (Docket No. 22 at 50). Moreover, Sun Life described "objective findings" on its APS forms and defined "objective medical evidence" in the letter to Brigham's attorney dated August 19, 1999. (Docket No. 22 at 366). The lack of *objective* medical evidence in the file can only be described as glaring. In all of the APS's, Dr. French fails to provide objective findings to support his conclusions. Furthermore, the letters provided by Drs. French, Reinert and Perri are almost entirely conclusory in nature. (Docket No. 22 at 392, 379, and 227 respectively).

As noted, plaintiff did submit other evidence, including the affidavits from plaintiff's family and friends, the approval letter from the Massachusetts Division of Medical Assistance, and the approval letter from the SSA for long term disability benefits. According to plaintiff's mother, "he cannot perform routine tasks on a regular ... basis without experiencing pain or some level of discomfort." (Docket No. 22 at 388). Plaintiff's aunt adds that she assists him with the preparation of meals, personal hygiene, dressing, transferring on and off the toilet, and bathing. (Docket No. 22 at 389). Brigham's father and neighbor, have offered the opinion that plaintiff is severely and totally disabled. However, this evidence, while relevant, does not rise to the level of "objective medical evidence." Similarly, the approval letters from the Massachusetts Division of Medical Assistance and the Social Security Administration, al-

though relevant, are not dispositive. *See Doyle v. Paul Revere Life Insurance Co.,* 144 F.3d 181, 186 n. 4 (1st Cir.1998) (finding that an SSA award that was made on the same evidence before the Plan administrator had no binding effect); *see also Socia,* 16 F.Supp.2d 66, 70 (D.Mass.1998). Sun Life was not unreasonable in giving less weight to this evidence than it did to Dr. French's repeated observations that plaintiff could do sedentary work, the TSA report, and the medical consultant's report. No evidence suggests that Sun Life's decision was unreasoned or unsupported by substantial evidence in the record. Defendant is therefore entitled to judgment as a matter of law.

## IV.   *CONCLUSION*

The strong and heartfelt letters from plaintiff's family and friends, and the obvious courage plaintiff has shown in facing his disability, make this a painful case. The law as it now stands, however, gives the defendant Sun Life the power to determine eligibility for benefits, providing its decision is not found to be arbitrary and capricious. The undisputed facts of record do not even come close to offering support for any such finding.

For these reasons, defendant's Motion for Summary Judgment on the only remaining count of the complaint is hereby ALLOWED and plaintiff's Motion is DENIED.

A separate order will issue.

## *ORDER*

For the reasons stated in the accompanying Memorandum, defendant's Motion for Summary Judgment (Docket No. 35) is hereby ALLOWED and plaintiff's Motion for Summary Judgment (Docket No. 39) is

hereby DENIED. The clerk will enter judgment for the defendant.

It is So Ordered.