Anthony J. Trenga, United States District Judge
In this ERISA-governed dispute, Plaintiff Stephanie Morris ("Plaintiff" or "Mrs. Morris") claims life insurance benefits based on the death of her husband, Stephen Morris ("Mr. Morris"). The dispositive *670 issue is whether Defendant Lincoln National Life Insurance Company ("Defendant" or "Lincoln") abused its discretion by denying Plaintiff's claim for those benefits on the grounds that Mr. Morris was "Totally Disabled" on January 1, 2015 and therefore ineligible for coverage under the Lincoln policy.
Pending before the Court are Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [Doc. No. 60] and Defendant's Motion for Summary Judgment ("Defendant's Motion") [Doc. No. 61] (collectively, the "Cross Motions"). For the following reasons, the Court concludes that under the applicable legal standard of review by this Court, Lincoln did not abuse its discretion in denying Plaintiff's claim for benefits and Plaintiff's Motion is therefore DENIED and Defendant's Motion is GRANTED.
I. BACKGROUND[1]
A. Progression of Mr. Morris's Illness
Mr. Morris was diagnosed with acute myeloid leukemia ("AML") on October 23, 2014 following an emergency room visit. LIN0533; LIN0152. At the time of this diagnosis, he was employed at OGSystems; and while he remained employed at OGSystems until his death on September 16, 2015, his illness prevented him from returning to work after October 23, 2014. LIN0533; LIN0152.
On October 24, 2014, Mr. Morris was admitted to the hospital to begin first-time chemotherapy treatments. LIN0665; LIN1280. As reflected in his medical records, Mr. Morris needed "ongoing therapy for leukemia after this cycle [of chemotherapy], plan dependent upon bone marrow biopsy results." LIN1261 (October 29, 2014 Progress Note by Nurse Practitioner Joyce Jackowski). Mr. Morris was advised that he would "need to be off work for at least 6 months" but "may work remotely at less than full-time hours as able depending upon physical condition." Id. It was also observed that Mr. Morris was "incapable of minimal (sedentary) activity" and should not be expected to return to work before April 1, 2015, as job modifications would not enable him to work without impairments. LIN0223 (October 30, 2014 Attending Physician Statement by Dr. Alix Spina).
After completing two lines of treatment, Mr. Morris was released from the hospital on December 6, 2014. LIN0665. On December 8, 2014 Mr. Morris's treating physician, Dr. Dipti Patel-Donnelly, indicated that he still had "significant residual disease" and that she was exploring other treatment options. LIN1536 (December 8, 2014 Treatment Note by Dr. Dipti Patel-Donnelly). Dr. Patel-Donnelly continued to closely monitor Mr. Morris's condition following his release from the hospital and noted that his symptoms had declined and his energy and ability to carry out basic tasks had improved during follow-up appointments on December 10, 12, and 14. See LIN1533; LIN1532; LIN1531. Nevertheless, in support of Mr. Morris's application for long-term disability benefits, Dr. Patel-Donnelly indicated that he remained severely immunocompromised and was being "worked up" for further treatment, including a stem-cell transplant. LIN1508 (December 19, 2014 Note Regarding Patient Status for Work/School by Dr. Dipti Patel-Donnelly). Thus, she wrote that Mr. Morris would be unable to work "at all" until June 30, 2015, when his status would be reevaluated. Id.
*671 Dr. Patel-Donnelly again met with Mr. Morris on December 24 and 30, 2014, and the possibility of Mr. Morris's participation in other clinical trials was discussed. LIN0142; LINO I 43. Dr. Patel-Donnelly indicated that the goal with respect to Mr. Morris's treatment was "to continue to treat him to bridge him to transplantation." LIN0143. At the December 30 appointment, Mr. Morris reported few symptoms and stated that he "generally feels well." LINO 142. However, as Dr. Patel-Donnelly told him and Mrs. Morris at the December 24 appointment, his overall prognosis remained poor, based on his "poor prognostic cytogenics and his incomplete response to current therapies." LIN0143. Just a week after the December 30 appointment, during a January 5, 2015 telephone call with a representative from Reliance Standard Life Insurance Company ("Reliance"), his employer's disability carrier, Mr. Morris said that he could not perform basic household tasks including driving, cleaning, and taking the trash out due in part to fatigue, and that he would not be returning to his occupation or any other occupation in the foreseeable future as he was not in remission. LIN1470.
Mr. Morris began a new line of treatment, his third, on January 7, 2015. See LIN1737. On the first day of the treatment, Dr. Patel-Donnelly indicated that Mr. Morris was doing "very well," that his "ECOG status" was at 1,[2] and that he was "clear to go ahead with the study." LIN0141. Mr. Morris was still doing well and reported few symptoms when Dr. Patel-Donnelly saw him a week later on January 14, 2015. LIN0140. However, approximately two weeks into the new treatment regimen, he began to develop complications, including achiness, fatigue, and a sore throat. LIN1382; LIN1384. Ultimately, Mr. Morris was forced to stop this line of treatment on February 4, 2015. LIN1377.
After his third treatment regime proved unsuccessful, Mr. Morris continued to meet with his doctors regularly. The progression of Mr. Morris's disease was not linear - notes from his treating physicians indicate that he experienced good spells, where his symptoms were minimal and he was able to participate in some activities, and bad spells, during which he was reliant on blood transfusions and hospitalized for complications from his leukemia. For example, on February 9, 2015, Dr. Yesid Alvarado reviewed Mr. Morris's suitability for a new trial, finding that he was "not overly tired" and once again giving him an ECOG score of 1. LIN2171. However, Mr. Morris complained of shortness of breath and fatigue in appointments with Dr. Patel-Donnelly on March 2 and Dr. Alvarado on March 12, LIN1366; LIN2171, and required blood transfusions on March 5 and March 13, LIN1364; LIN2168. Mr. Morris was then admitted to the hospital to continue treatment on March 13, LIN2163, before he was discharged on March 22, LIN2159-61, and re-admitted with complications on March 30, 2015, LIN2153.
While Mr. Morris's symptoms fluctuated, the underlying progression of the disease continued. A bone marrow biopsy on April 13, 2015 showed "persistent disease, *672 35% blasts," indicating that Mr. Morris was not in remission. LIN2144. Another bone marrow biopsy on May 22, 2015 showed "74% blasts," meaning the disease was continuing to advance. LIN1356. On May 28, 2015, Dr. Alvarado indicated that there remained "evidence of pervasive disease" and that the prognosis was "very poor." LIN2139. Mr. Morris was hospitalized again on July 2, 2015, and though he was discharged four days later, the discharge note stated that his "[o]verall prognosis is exceedingly poor." LIN2107.
Despite Mr. Morris's increasingly poor prognosis, he still had good days. On August 3, 2015, Dr. Patel-Donnelly noted that Mr. Morris had taken a trip to Ocean City, Maryland with his family, where he "was able to participate in most activities such as putt-putt and walks on the beach." LIN1359. Two days later, on August 5, Mr. Morris had a palliative care consult where his only complaints were fatigue and some dyspnea on exertion. LIN 1347.
On August 21, 2015, Mr. Morris met with Dr. Maritza Frazier-Sinclair about another possible treatment. LIN2101. Dr. Frazier-Sinclair advised him that his chances of remission under the new treatment were "in the single digits." LIN2105. On August 27, 2015, Dr. Patel-Donnelly indicated that Mr. Morris had "no plans for further treatment" and was instead choosing to continue with "supportive care measures" that did not treat the underlying disease but could postpone complications. LIN1343.
Mr. Morris passed away from leukemia on September 16, 2015. From the time of his diagnosis through his death, Mr. Morris's leukemia never went into remission, his immune system remained compromised, and he did not return to work at OGSystems or anywhere else.
B. Lincoln Life Insurance Policy
Until December 31, 2014, Mr. Morris and other OGSystems employees were offered life insurance through a group policy provided by Reliance (the "Reliance Policy"). On January 1, 2015, Lincoln assumed providing life insurance benefits to OGSystems' employees under a group life insurance policy (the "Lincoln Policy").[3] See LIN0014; LIN0070. The Lincoln Policy has an "actively-at-work" provision, under which an employee is not covered until he or she is actively at work after the Lincoln Policy is in effect. LIN0019; LIN0078. The policy defines actively-at-work to mean "the full-time performance of an employee's occupation at the [employer's] place of business (or other location to which the employee is required to travel." LIN0018; LIN0077. It is undisputed that Mr. Morris was never actively at work for the purposes of coverage under the Lincoln Policy.
However, on April 4, 2015, the Lincoln Policy was amended to include a provision titled "Prior Insurance Credit Upon Transfer of Life Insurance Carriers," known as the "PIC provision," which essentially operates to extend coverage to employees who were not actively working but who were not totally disabled during the transition from the Reliance Policy to the Lincoln Policy. See LIN0034; LIN0092. Specifically, it provides:
*673 FAILURE TO SATISFY ACTIVE WORK RULE. Subject to payment of premiums, this Policy will provide life coverage for a Person who:
(1) was insured under the prior plan on its termination date;
(2) was otherwise eligible under this Policy; but was not Actively-At-Work due to Injury or Sickness on its Effective Date;
(3) is not entitled to any extension of life insurance under the prior plan; and
(4) is not Totally Disabled (as defined in the Extension of Death Benefit section of this Policy) on the date this Policy takes effect.
Id.
Under the Extension of Death Benefit section of the Lincoln Policy, "Totally Disabled" is defined to mean that an employee is "unable, due to sickness or injury, to engage in any employment or occupation for which [he is] or become[s] qualified by reason of education, training, or experience" and is "not engaging in any gainful employment or occupation," LIN0023, or is "unable, due to sickness or injury, to perform the material and substantial duties of any employment or occupation for which [they] are or become qualified by reason of education, training, or experience" for at least 180 days. LIN0081. These definitions differ slightly in their wording, but both articulate that in order to be considered totally disabled under the Lincoln policy, an employee must not be able to engage in any employment or occupation for which they are qualified.
C. Procedural History
On November 3, 2015, Plaintiff filed a claim for life insurance benefits under the Lincoln Policy, which Lincoln initially denied on December 3, 2015 on the grounds that Mr. Morris was never actively at work when the Lincoln Policy was in effect. Mrs. Morris appealed that decision on March 30, 2016, citing the Lincoln Policy's PIC provision. On June 20, 2016, Lincoln denied Plaintiff's appeal on the grounds that she failed to comply with its request to provide a formal denial of benefits from Reliance, OGSystems previous life insurance provider, thereby confirming that Mr. Morris was not "entitled to any extension of life insurance under the prior plan," as the PIC coverage requires.
Having exhausted the administrative process under ERISA, Plaintiff filed this action on July 20, 2016. In September 2017, this Court considered the parties' initial Motions for Summary Judgment [Doc. Nos. 17 and 20]. The dispositive issue before the Court at that time was whether Lincoln abused its discretion by denying Plaintiff's claim on the basis that she did not provide a formal denial of benefits from Reliance. In its September 29, 2017 order, the Court concluded that Lincoln's denial of Plaintiff's claim on those grounds constituted an abuse of discretion. [Doc. No. 32] at 8. The Court found that because "Lincoln ultimately made its decision to delay benefits on a procedural matter" it had "never reached or decided the remaining substantive question under the PIC provision: whether Mr. Morris was Totally Disabled (as defined in the Extension of Death Benefit section of th[e] Policy) on January 1, 2015, the date the Lincoln Policy took effect." Id. at 11 (internal quotation marks omitted). The Court remanded the case to Lincoln to consider that question. Id. at 12.
On remand, Lincoln's initial review was assigned to Claims Consultant Joshua Splattstoesser. See LIN2411. On November 8, 2017, Plaintiff, through counsel, submitted a letter outlining her arguments as to why Mr. Morris was not Totally Disabled on January 1, 2015. LIN1581-87. Included *674 with the letter were Mr. Morris's medical records, as well as letters from five of Mr. Morris's friends and co-workers describing their interactions with him around the relevant time period. LIN1583-85; LIN1585-86. The review of Mr. Morris's claim was first assigned to Registered Nurse Fil Castillo. After reviewing the claim, Nurse Castillo concluded that the "medical findings support functional impairments that would preclude any reliable and consistent work at least from 1/1/15 to 9/16/15 due to treatment refractory AML." LIN0008. Nurse Castillo found that there was "no medical disagreement" as "[m]ultiple physician specialties recommended a total no work status," referring specifically to the reports of Dr. Spina on October 30, 2014 and Dr. Patel-Donnelly on December 4 and 19, 2014, as well as medical records from the same time period. Id.
The claim was then reviewed by Dr. Lee Hartner, who is board-certified in internal medicine, oncology, hematology, and hospice and palliative medicine. LIN 1561. As part of his review, Dr. Hartner spoke with Dr. Patel-Donnelly, who told him, as noted in his report, "that the patient was unable to work at all during [the relevant] period of time due to his ongoing treatment and chronically low counts." LIN1557. Based on his review of the medical records, Dr. Hartner concluded that given Mr. Morris's "need for ongoing treatment and his continued active [leukemia ], he was unable to work in any capacity from 10/23/2014 forward and particularly from 01/01/15." LIN1560.
By letter dated March 5, 2018 from Mr. Splattstoeser, Lincoln advised Plaintiff of its determination that Mr. Morris was Totally Disabled within the meaning of the Lincoln Policy from October 23, 2014 through the time of his death. LINl 108-12. Mr. Splattstoesser's letter referenced the applicable policy language and Dr. Hartner's findings, as well as documents from Reliance's files on Mr. Morris's disability claims, including documentation of Mr. Morris's January 5, 2015 statement that he would not be returning to any occupation in the foreseeable future because he was not in remission. See LN 1110.
By letter dated May 9, 2018, Plaintiff administratively appealed Lincoln's determination according to its appeals process. LIN 1040-64. In support of that appeal, Plaintiff submitted additional documents, including Dr. Patel-Donnelly's May 2, 2018 responses to a questionnaire prepared by Plaintiff's counsel, LIN1067-68; a May 7, 2018 letter from Mr. Morris's employer, OGSystems, stating that it would have found part-time work for him to do remotely if asked, LIN1070; and an April 17, 2018 vocational analysis from a vocational rehabilitation consultant describing the kinds of part-time jobs that might be available to someone with Mr. Morris's education and work history, LIN1072-78.
Plaintiff's appeal was assigned to Claims Consultant Sara Thompson, LIN0007, who subsequently referred the file for a clinical review by Registered Nurse Lynn Sucha on May 22, 2018, LIN0006. Nurse Sucha completed her review on June 11, 2018, finding that "[t]he medical records available support restrictions to all work from 10/23/2014 forward to date of death." LIN0006; LIN0118-19. In her report, Nurse Sucha specifically cited to various medical records, including Dr. Patel-Donnelly's December 19, 2014 note stating that Mr. Morris would be unable to return to work "at all" until at least June 30, 2015, as well as various records documenting when Mr. Morris was "doing well" or had received an ECOG score of 1. LIN0117-18. In that regard, Nurse Sucha noted that Mr. Morris "may have had the ability for occasional intermittent activity," but nevertheless found that the medical record *675 supported the conclusion that he would be unable to "sustain any type of employment" from October 23, 2014 forward. LIN0118-19.
By letter dated June 14, 2018, Ms. Thompson upheld Lincoln's prior determination that Mr. Morris was Totally Disabled within the applicable terms of the Lincoln Policy, and thus ineligible for coverage. See LIN0107-14. In reaching this decision, Ms. Thompson concluded that the "physical examinations, diagnostic evidence, and lab work in the file shows that [Mr. Morris] would have been significantly impaired and unable to work in any occupation." LIN0113.
On June 22, 2018, following Lincoln's denial of Plaintiff's claim for benefits, Plaintiff moved to reopen this case and on June 29, 2018, the parties by joint stipulation agreed that the case was "ripe for judicial resolution by cross-motions for Summary Judgment." [Doc. No. 49] at 2. After the filing of the administrative record and briefing, the Court held a hearing on the Cross Motions on October 12, 2018, at the conclusion of which it took the Cross Motions under advisement.
II. STANDARD OF REVIEW
Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) ; see also Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; Evans v. Techs. Apps. & Serv. Co. , 80 F.3d 954, 958-59 (4th Cir. 1996). On a motion for summary judgment, the facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. Anderson , 477 U.S. at 255, 106 S.Ct. 2505. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56...." Desmond v. PNGI Charles Town Gaming, LLC , 630 F.3d 351, 354 (4th Cir. 2011). "In the context of an ERISA appeal, however, th[e] [c]ourt's factual inquiry focuses on the adequacy of administrative record. If the administrative record is inadequate to permit th[e] [c]ourt to reach a judgment as a matter of law, th[e] [c]ourt must remand the matter to the plan administrator for further proceedings." Ulsaker v. Lincoln Nat. Life Ins. Co. , 2011 WL 4621030, at *4 (E.D. Va. Sept. 30, 2011) (citing Bernstein v. CapitalCare, Inc. , 70 F.3d 783, 788-89 (4th Cir. 1995) ).
Under ERISA, a beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 11132(a)(1)(B). "Although ERISA itself is silent on the standard for denials of benefits challenged under § 1132(a)(1)(B), Firestone establishes that a de novo standard applies 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case the exercise of assigned discretion is reviewed for abuse of discretion." Evans v. Eaton Corp. Long Term Disability Plan , 514 F.3d 315, 321 (4th Cir. 2008) (quoting Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ).
The Lincoln Policy unambiguously affords Lincoln the discretionary authority to determine eligibility for benefits and to *676 construe the terms of the plan.[4] Thus, Lincoln's determination as to Plaintiff's eligibility for benefits is reviewed by the Court for an abuse of discretion. The Court's abuse of discretion review is "limited to the administrative record, which consists of the claim file and the plan documents." Hilton v. UNUM Life Ins. Co. of Am. , 967 F. Supp. 2d 1114, 1119 (E.D. Va. 2013) (citing Williams v. Metropolitan Life Ins. Co. , 609 F.3d 622, 631 (4th Cir. 2010) ).
III. ANALYSIS
The dispositive and only issue in resolving the cross motions for summary judgment is whether Lincoln abused its discretion by determining on remand that Mr. Morris was "Totally Disabled" under the Lincoln Policy on January 1, 2015 and was thus not covered under the Lincoln Policy.
In the ERISA context, plan administrators' determinations as to eligibility for benefits are afforded a great deal of deference. The abuse of discretion standard essentially reduces to whether the plan administrator's decision was reasonable; if an administrator's decision was reasonable, the reviewing court cannot disturb it, even if the court would have reached a different decision in the first instance. Evans , 514 F.3d at 322 ; Donovan v. Eaton Corp. Long Term Disability Plan , 462 F.3d 321, 326 (4th Cir. 2006).
A "decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Evans , 514 F.3d at 322 (internal quotation marks omitted). "Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that 'a reasoning mind would accept as sufficient to support a particular conclusion.' " Donnell v. Metro. Life Ins. Co. , 165 F. App'x 288, 295 (4th Cir. 2006) (quoting LeFebre v. Westinghouse Elec. Corp. , 747 F.2d 197, 208 (4th Cir. 1984) ). In assessing the reasonableness of a plan administrator's decision, the Fourth Circuit has also identified eight non-exclusive factors for courts to consider:
(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements *677 of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.
Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan , 201 F.3d 335, 342-43 (4th Cir. 2000). The first factor, the language of the plan, can be dispositive: "[i]f the denial of benefits is contrary to the clear language of the plan, the decision will constitute an abuse of discretion." Lockhart v. United Mine Workers 1974 Pension Trust , 5 F.3d 74, 78 (4th Cir. 1993) (internal citations and quotation marks omitted). The same is not true of other factors, such as the fiduciary's motives and any conflict of interest it may have, which courts may consider but must weigh as "one factor among many" in determining whether there is an abuse of discretion. Metropolitan Life Ins. Co. v. Glenn , 554 U.S. 105, 116, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).
Based on the administrative record, the Court concludes that Lincoln's determination that Mr. Morris was Totally Disabled under the Lincoln Policy on January 1, 2015 was the result of a deliberate, principled reasoning process. Lincoln's initial denial of Mr. Morris's life insurance benefits was on procedural grounds, and as such, its initial review never reached or decided whether Mr. Morris was Totally Disabled under the Lincoln Policy on January 1, 2015. On remand, Plaintiff's claim was reviewed by five different reviewers, three of whom are medical professionals, each of whom documented in their reports the evidence they reviewed and pointed to information in the medical record and other claim documents that led them to conclude that Mr. Morris was Totally Disabled within the meaning of the Lincoln Policy.
In reaching the conclusion that Mr. Morris was totally disabled, the claim administrators at Lincoln relied on the medical evaluations of Dr. Hartner, Nurse Castillo, and Nurse Sucha, which were formed based on their review of the medical record. Lincoln's claim administrators also pointed to the following specific statements in the record as supporting the conclusion that Mr. Morris was Totally Disabled: (1) an Attending Physician Statement from Dr. Spina on October 30, 2014 stating that Mr. Morris was "incapable of minimal (sedentary) activity" and should not be expected to return to work before April 1, 2015, as job modifications would not enable him to work without impairments, LIN0223; (2) a note from Dr. Patel-Donnelly on December 19, 2014 stating that Mr. Morris would be unable to work "at all" until June 30, 2015, when his status would be reevaluated, LIN1508; and (3) Mr. Morris's January 5, 2015 statements to Reliance that he would not be returning to his occupation or any other occupation in the foreseeable future as he was not in remission, LIN1470. These statements, in the absence of any contrary contemporaneous statements in the record regarding Mr. Morris's ability to work,[5] and in conjunction with the evaluations of the medical reviewers at Lincoln, provided substantial evidence in support of Lincoln's determination that Mr. Morris was Totally Disabled as of January 1, 2015.
Plaintiff argues that Lincoln's review process was deficient and its determination *678 was not supported by substantial evidence for a number of reasons. First, Plaintiff contends that Lincoln ignored evidence of Mr. Morris's improved condition after October 30, 2014, including records of appointments where he reported few symptoms and rated well on the ECOG Performance Scale, as well as testimonials from Mr. Morris's friends regarding his improved health and a report prepared by a vocational consultant detailing part-time work-from-home jobs Mr. Morris would have been able to perform. [Doc. No. 63] at 25-26. However, the record does not support Plaintiff's contention that Lincoln ignored evidence of improvements in Mr. Morris's condition - Nurse Sucha's report in particular cites to parts of the medical record documenting when Mr. Morris was "doing well" or had received an ECOG score of 1. LINO 117-18. Lincoln thus appears to have considered these reports but determined that they were outweighed by other evidence in the medical record, including contemporaneous statements from Mr. Morris and multiple providers as to his inability to work.
With regard to the testimonials and vocational consultant's report, courts within the Fourth Circuit have found that plan administrators are well within their rights to assign little weight to both of these categories of evidence. Letters from co-workers and friends attesting to Mr. Morris's ability to perform his job duties are "not the type of evidence that outweighs the medical evidence and physical examination results in the record." See Childers v. United of Omaha Life Insurance Co. , 2013 WL 683498, at *27 (S.D.W. Va. Feb. 22, 2013). Nor is the report of a vocational consultant, as the scope of these consultants' expertise is limited because they "are not experts in psychology who are qualified to render opinions on how the claimant's ailments might be reflected in his capabilities; rather, they are employment experts who know the mental and physical demands of different types of work." Fisher v. Barnhart , 181 F. App'x 359, 365 (4th Cir. 2006). Faced with a medical record replete with evidence of Mr. Morris's inability to engage in any work on any significant basis, Lincoln did not abuse its discretion by failing to give dispositive, or even substantial, weight to statements by those without the medical expertise necessary to make such determinations.
Plaintiff also argues that Lincoln abused its discretion by relying, in part, on Dr. Patel-Donnelly's statements that Mr. Morris was unable to work "at all," first in a December 19, 2014 note and later in a conversation with Dr. Hartner after Mr. Morris's death in light of her post hoc statement that Mr. Morris was capable of working "a few hours a day erratically depending upon the [symptoms] and counts." [Doc. No. 63] at 26. However, Lincoln was entitled to assess the weight to be given these various assessments in light of their timing and context, and to give more weight and credit to Dr. Patel-Donnelly and other medical professionals' contemporaneous assessments of Mr. Morris's capacity to work than post hoc assessments given for the purposes of supporting Plaintiff's attempt to secure life insurance benefits. See, e.g. , Brigham v. Sun Life of Canada , 183 F. Supp. 2d 427, 436 (D. Mass. 2002), aff'd , 317 F.3d 72 (1st Cir. 2003) ("[I]t was reasonable for Sun Life to consider the possibility that notification to Brigham of the impending end of [his benefits] may have influenced the opinions on [the treating physician's] form."); Wilson v. Reliance Standard Life Ins. Co. , 2018 WL 994327 at *6 (E.D. Mich. Feb. 21, 2018) (treating physicians' "abrupt shift in position" indicates that they "simply rubber-stamped [the plaintiff's] claim"); see *679 also Evans , 514 F.3d at 323, 326 (noting that where "the most striking feature of the medical evidence ... [was] its cross-cutting ambiguity," an ambiguous medical record necessitates deference to the determination of the administrator.)
Plaintiff also argues that Lincoln's determination constitutes an abuse of discretion because it does not "reflect careful attention to the language of the plan." Specifically, Plaintiff claims that Lincoln (1) did not sufficiently focus its decisionmaking on whether Mr. Morris was Totally Disabled on the specific date of January 1, 2015 and instead considered his ability to work during periods that were irrelevant to the Policy's language; and (2) failed to point to any evidence that Mr. Morris was unable to engage in any occupation or employment on the date in question, as the language of the Policy requires. [Doc. No. 63] at 23-24.
Though January 1, 2015 is the dispositive date for determining whether Mr. Morris was able "to engage in any employment or occupation for which [he is] or become[s] qualified by reason of education, training, or experience," the evidence in the administrative record, both before and after January 1, 2015, was relevant to and properly considered in connection with that determination. See Donovan , 462 F.3d at 327 (finding that the plaintiff was unreasonably denied benefits where the plan administrator "measured what [she] could do for the very brief window of time that [she] was with the evaluator").
Nor does it appear that Lincoln ignored the language of the Plan, which defined "Total Disability" to require that an employee is "unable, due to sickness or injury, to engage in any employment or occupation for which [he or she is] or become[s] qualified by reason of education, training, or experience," LIN0023, or is "unable, due to sickness or injury, to perform the material and substantial duties of any employment or occupation for which [he or she is] or become[s] qualified by reason of education, training, or experience," LIN0081. The administrative record contains ample evidence that Mr. Morris did not have that ability, even though there may have been days during which he had more energy that others. All of Lincoln's medical reviewers found that Mr. Morris was unable to work "at all" as of January 1, 2015, a conclusion that echoes the statements of Dr. Spina on October 30, 2014, Dr. Patel-Donnelly on December 19, 2014, and Mr. Morris himself on January 5, 2015, and the letters from Lincoln's claim consultants denying Plaintiff's claim specifically reference the definition and point to evidence in the medical record that supports Lincoln's finding that Mr. Morris satisfied the Plan's definition of "Total Disability." See LIN1109-10; LIN0109-10.
Plaintiff contends that "any reasonable reading of the law ... leads to the conclusion that [Mr. Morris] would have had to be virtually bed-ridden on January 1, 2015, in order to be 'Totally Disabled' under [the Lincoln] policy." [Doc. No. 63] at 11. But the phrase "to engage in any employment or occupation" certainly implies an ability to perform the essential requirements of any particular employment or occupation at some minimally acceptable sustained level; and in interpreting similar "any occupation" policy language, the Fourth Circuit has held that "the phrase 'prevented from engaging in every business or occupation' cannot be construed so narrowly that an individual must be utterly helpless to be considered disabled." Bilheimer v. Federal Exp. Corp. Long Term Disability Plan , 605 Fed. App'x 172, 181 (4th Cir. 2015) (per curiam) (citing VanderKlok v. Provident Life & Accident Ins. Co. Inc. , 956 F.2d 610, 614-15 (6th Cir. 1992) ).
*680 Though the administrative record reflects that on occasion Mr. Morris enjoyed "good days," there is little, if any support, for the view that he had the ability to engage in any employment or occupation at a level that an employer would find acceptable. Lincoln did not abuse its discretion in determining that he was "Totally Disabled" under the Plan on January 1, 2015 based on the medical record and the statements of its medical reviewers and Mr. Morris's treating physicians as to his inability to work at all.
For the foregoing reasons, it is hereby
ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 60] be, and the same hereby is, DENIED; and it is further
ORDERED that Defendant's Motion for Summary Judgment [Doc. No. 61] be, and the same hereby is, GRANTED; and it is further
ORDERED that this action be, and the same hereby is, DISMISSED.

This background is drawn from the administrative record filed with the Court on August 1, 2018 [Doc. Nos. 54-57]. The administrative record consists of eleven subparts, bates-numbered LIN000I-LIN2913; the Court cites to the administrative record by bates number.

"The ECOG Scale of Performance Status ... describes a patient's level of functioning in terms of their ability to care for themself, daily activity, and physical ability (walking, working, etc.)." Coty v. Colvin , 2016 WL 1211284, at *5, n. 2 (W.D.N.Y. Mar. 29, 2016) (citing ECOG Performance Status, http://ecog-acrin.org/resources/ecog-performance-status) (internal quotation marks omitted). "[A] score of 1 indicates a patient who is restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work." Id. (internal quotation marks and alterations omitted).

There are actually two Lincoln Policies-the Basic Life Insurance Policy (which provides approximately $ 246,000 in coverage) and the Voluntary Life Insurance Policy (which provides $ 500,000 in coverage). Both contain the same relevant language and are together referred to herein as the "Lincoln Policy." Plaintiff's claim arises under the Prior Insurance Credit ("PIC") provision of the Lincoln Policy, which limits the total coverage to the same amount offered by the prior carrier. Thus, Plaintiff's total claim is for $ 600,000. [Doc. No. 68] at 1, n. 1.

In relevant part, the Lincoln Policy provides:
|LINCOLN'S| DISCRETIONARY AUTHORITY. Except for the functions that this Policy clearly reserves to the Group Policyholder or Employer, [Lincoln] has the authority to:
(1) manage this Policy and administer claims under it; and
(2) interpret the provisions and resolve questions arising under the Policy.
[Lincoln's] authority includes (but is not limited to) the right to:
(1) establish and enforce procedures for administering the Policy and claims under it;
(2) determine [employees'] eligibility for insurance and entitlement to benefits;
(3) determine what information [Lincoln] reasonably requires to make such decisions; and
(4) resolve all matters when a claim review is requested.
Any decision [Lincoln] makes, in the exercise of its authority, shall be conclusive and binding; subject to the [insured person's or] Beneficiary's rights to:
(1) request a state insurance department review; or
(2) bring legal action.
L1N0032.

The closest thing to a contrary contemporaneous statement in the record is Nurse Practitioner Joyce Jackowski's October 29, 2014 progress note indicating that she advised Mr. Morris that he would "need to be off work for at least 6 months" but "may work remotely at less than full-time hours as able depending upon physical condition." LIN 1261. However, the very next day, Dr. Spina indicated that Mr. Morris would not be able to work at all before April 1, 2015. LIN0223.